IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALBERTHA COLEMAN,

          Plaintiff,

    v.

MICHAEL J. ASTRUE,
Commissioner of Social
Security,

          Defendant.

Case No. 07 C 958

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Albertha Coleman (hereinafter, "Coleman") filed this action seeking judicial review of the final decision of the Commissioner of Social Security denying her application for Disabled Widow's Insurance Benefits ("DWIB"). The parties have filed Cross-Motions for Summary Judgment. For the following reasons, Plaintiff's Motion is Granted and Defendant's Motion is Denied. This case is remanded to the Commissioner for further proceedings consistent with this order.

### I.  PROCEDURAL BACKGROUND

On July 21, 2003, Coleman filed an application for DWIB. AR 98. She had been unable to work since April 14, 1998 due to bipolar disorder with psychotic features, thyroid problems, and numbness in her feet. *See* AR 141, 178, 221. The Social Security Administration (the "SSA") denied her claim. AR 57. A hearing was

held before an Administrative Law Judge (the "ALJ"), and Coleman and James Radke, a vocational expert (the "VE"), testified at the hearing. AR 30-52. On December 7, 2005, the ALJ found that Coleman met all of the nondisability requirements for DWIB: that her bipolar disorder, obesity, and status post thyroidectomy are considered "severe" under the regulations at 20 C.F.R. § 404.1520(c); that these medically determinable impairments do not meet one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4; that Coleman could not perform her past relevant work and did not possess any transferable skills; but that she had the residual functional capacity to perform simple unskilled work that does not involve more than low levels of stress or regular contact with the public. AR 21-22. Thus, the ALJ found that Coleman was not under a disability and not entitled to benefits. AR 22-23.

The Appeals Council denied Coleman's request for review of the ALJ's decision. Coleman filed an action in this Court on February 20, 2007. She challenges only the ALJ's determination with respect to her mental impairments. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II. **FACTUAL BACKGROUND**

Coleman was born in 1953. She attended three years of college and received an associate's degree in accounting. AR 31. She graduated from the Chicago Police Academy and worked as a police officer from 1986 to 1993 and as a 911 dispatcher until 1998. AR

178, 233. Coleman's husband died on February 18, 1992, leaving three minor children in her care. AR 98, 104-05.

Coleman first experienced a mental breakdown in 1997 and was hospitalized for mental health treatment several times between 1997 and 1999. *See* AR 178-79, 184, 190-91. She stopped working on April 15, 1998 due to her deteriorating mental condition. She had been treated with Zoloft, but she stopped taking it in September 1998. AR 178. She was taken to the emergency room at Rush Medical Center on November 12, 1998. *Id*. Her behavior was "very irregular with periods of complete remission followed by bizarre activity and delusions," such as "repeatedly snapp[ing] her head, bow[ing] her head and ma[king] strange motions with her hands," urinating on herself in a chair, saying that she "lost herself in the elevator and request[ing] to return to the elevator to find herself." *Id*. After six days, Coleman was discharged with Zyprexa and Tegretol and given instructions to follow up with her psychiatrist from the Police Department. AR 179. Her final diagnosis was "bipolar affective disorder versus schizoaffective." AR 178.

Coleman was admitted to Rush again on December 28, 1998, after three other ER visits in one week due to "bizarre delusions and evidence of internal stimulation." AR 184. She complained that her skin was melting and that there was a fluid imbalance in her head. *Id*. She was treated with Lithium, Haldol/Zyprexa, and Klonopin, which "gradually improved" her delusional thinking. *Id*. She was given a final diagnosis of "[s]chizoaffective disorder with

- 3 -

depressed mood versus major depression with psychotic features." *Id.* The doctor wrote that she had "[h]orrible insight" and a GAF score of 25. GAF scores from 21-30 indicate behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. *See* Pl.'s Mem. at 4 n.2; Def.'s Mem. at 3 n.2.

On October 3, 1999, Coleman was admitted for mental health treatment at Jackson Park Hospital. AR 190. She "presented with a history of increasingly bizarre and erratic behavior over the past few days," including "having periods of rage alternating with periods when she would be mute and unresponsive, almost catatonic," as well as "act[ing] like she was in a trance with rocking and humming behavior." *Id.* She had stopped taking Zyprexa and Lithium around June or July; she did not like the effects of the medication on her. AR 195. The attending physician noted that her affect was decreased, no thought process disorder was noted, and that she denied visual hallucinations, but "at times . . . she hears voices inside of her head creating a loud noise." AR 190. Coleman was given Ativan, Zyprexa, and Lithium. AR 191. Her final diagnosis was "bipolar disorder, mixed type," "noncompliant with medications, moderate," and a GAF of 30. *Id.* Her prognosis was "[g]uarded secondary to previous noncompliance with medication." *Id.* The occupational therapist noted that she had poor coping and problem solving skills as well as decreased self-esteem, educational skills, and vocational training. AR 205.

In October 2001, Coleman began seeing Dr. Elena Tylkin, a psychiatrist at Fantus Health Center, for medication refills and continued care. AR 290-91. A psychiatric evaluation dated November 9, 2001 indicates Coleman was experiencing crying spells for no apparent reason, decreased sleep and appetite, and anxiety about her children. AR 289. She reported no mania, psychosis, or panic. *Id.*

Coleman saw Dr. Tylkin about every one to six months from April 2002 until August 2005. AR 276-88. During appointments in April, September, and December 2002, Coleman was continued on medication and scheduled for follow-ups. AR 286-88. In June 2003, Coleman reported feeling depressed and anxious. Her anxiety woke her at night, and she had pain in her feet and a tremor in her hand. AR 285. Dr. Tylkin noted during an exam in August 2003 that Coleman had been in the ER recently due to a panic attack that Coleman was "still depressed and anxious," and that the Zoloft "does not work." AR 284. Dr. Tylkin prescribed Coleman other medications. *Id.*

On September 19, 2003, Coleman was examined by Dr. Patil, an internal medicine consultative examining physician. AR 228. Dr. Patil examined Coleman for about 35 minutes. *Id.* He did not review any medical reports from the Bureau of Disability Determination Services. *Id.* Coleman reported a history of depression and denied hearing voices at that time. With respect to Coleman's mental status, Dr. Patil concluded that her affect was

blunted, her mood was mildly depressed and withdrawn, she had no hallucinations, her judgment and insight were fair, and she possessed simple mathematical skills. AR 230.

On October 21, 2003, Coleman was evaluated by a consultative examining psychiatrist, Dr. Gilbert Hefter, who saw her for about 45 minutes. AR 232-33. In preparation for this evaluation, Dr. Hefter reviewed some of Coleman's medical records. AR 232. Dr. Hefter asked Coleman what her problems were, and she reported having troubled thoughts and hallucinations. He asked her a few questions testing her orientation to time, place, and person, such as asking her to name five large U.S. cities, subtract serial sevens, and describe the difference between a boat and a car. She answered these questions satisfactorily. AR 233. He noted that she "presented with a moderately depressed affect" and "[t]here was no evidence, other possibly than in her history, of a thought disorder." *Id*. He diagnosed her with bipolar disorder with psychotic features, by history, and he commented that "[h]er ability to do work-related activity involving understanding and memory appeared reasonably intact, while there seemed to be some compromise of her sustained concentration and persistence, social interaction, and adaptation." *Id.*

In October 2003, Coleman was examined by a doctor filling in for Dr. Tylkin at Fantus, who noted that Coleman reported feeling better, having fair energy and good appetite, and that the medication made her sleepy, requiring her to take naps during the

day. AR 283. The notes indicate that her mood was better and insight fair, and her medications were refilled. *Id.*

On November 4, 2003, a Bureau of Disability Determination Services psychologist, Dr. Carl Hermsmeyer, completed a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Form assessing Coleman's current mental symptoms under the affective disorders listing (listing 12.04). AR 248, 262. He noted that Coleman had bipolar disorder and that her functional limitations were only mild (with respect to restriction of activities of daily living) to moderate (with respect to difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace). AR 258. He checked boxes indicating that Coleman was not significantly limited in areas of understanding and memory, sustained concentration and persistence, social interaction, or adaptation, except that she was moderately limited in the ability to understand, remember, and carry out detailed instructions. AR 262-63. He concluded that Coleman had bipolar disorder with psychotic features, but that based on the two consultative examinations, "she has the mental capacity to perform simple tasks." AR 264.

In November 2003, Coleman reported feeling better, but Dr. Tylkin noted that her affect was blank and added Prozac to her prescriptions. AR 282. In February 2004, Dr. Tylkin noted that Coleman was stable on her medications without side effects, but as before, her affect was blank. AR 281.

On March 18, 2004, Dr. Tylkin completed a mental impairment questionnaire for Coleman. AR 266-69. She diagnosed Coleman with bipolar disorder and a current GAF of 50. (GAF scores of 41-50 indicate serious symptoms or impairments. Def.'s Mem. at 3 n.2.) She described Coleman as having "motor and mental retardation, low energy, poor concentration" and stated her prognosis was "uncertain." AR 266. Coleman's symptoms included "generalized persistent anxiety," "mood disturbance," "difficulty thinking or concentrating," "persistent disturbances of mood or affect," "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)," and "sleep disturbance." AR 267. Dr. Tylkin noted that Coleman's functional limitations were "marked" with respect to "restriction of activities of daily living," "difficulties in maintaining social functioning," and "deficiencies of concentration, persistence or pace," and that she had had three repeated episodes of decompensation within a 12-month period. AR 268. Dr. Tylkin also concluded that Coleman had "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," an "inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement," and that Coleman's

impairments would likely cause her to miss work more than four days per month. AR 268-69.

Consistent with this evaluation, in July 2004, Coleman told Dr. Tylkin that she felt "so-so" and "on the edge anxiety." AR 278. Dr. Tylkin found her affect was still restrained and her mood anxious. *Id.* On March 11, 2005, Coleman saw a different physician at Fantus, who wrote that she was "stable." AR 279. In June 2005, Dr. Tylkin refilled Coleman's prescriptions and scheduled a follow-up appointment. AR 276.

At her administrative hearing on August 2, 2005, Coleman testified that she stopped working for the police department because she "was passing out and hallucinating, became paranoid and . . . couldn't function at all." AR 32. When asked about whether she was functioning on her medications, she answered that she stopped taking some of her medications because they made her sick, irritated her stomach, and made her dizzy. AR 33. She also testified that medications helped but did not completely alleviate her problems, and they made her groggy. AR 32, 34. Moreover, despite the medication, her mind was "working overtime," she had "difficulty resting," would "get[] paranoid," and "see" and "feel things . . . that[ are] not there." AR 36-37. This made her afraid, and while on "some days [she could] handle it really okay, some days . . . [she had] a hard time." AR 38.

Coleman testified that her daily routine included taking her medications, watching t.v., sometimes doing a little cleaning, and

napping every day. AR 39. She only got dressed about twice a week, because "[i]t's a little difficult. I'm having trouble. I[t] sounds strange, but sometimes the water affects my skin, and I don't like the feeling of the water on me." AR 39-40. She did not go out socially because she found it stressful to carry on conversations. AR 40-41.

A vocational expert, James Radke, testified at the hearing. In response to a hypothetical posed by the ALJ, he concluded that for a 56-year-old individual who had Coleman's work experience and education and was limited to simple, unskilled, low stress jobs without regular general public contact, there would be approximately 1,200 assembly, 10,200 maid, 5,200 groundskeepers, and 4,000 dishwasher jobs available in the nine-county northeastern Illinois area. AR 48-49. He also testified that if a person could not complete a normal work day or workweek due to psychological factors, there would be no full-time jobs they could perform.

In her decision, the ALJ found Coleman's testimony "generally credible," AR 20, and noted that Dr. Hermsmeyer's notes indicated that Coleman had "some deficits in sustained concentration and persistence [and] social interaction and adaptation," but that Coleman "retained the ability to perform simple tasks in a work setting." AR 18. The ALJ stated, "[w]ith respect to her mental impairment, the undersigned finds the state agency's assessment . . . not out of line with the evidence." AR 19. The ALJ concluded that:

> the record as a whole simply does not support a finding that claimant's impairments are disabling. Admittedly, the notes from her treating psychiatrist are difficult to read . . . ; however, they are legible enough to conclude that, at least through March 2005, she remained fairly stable when compliant with treatment. . . . Therefore, the undersigned cannot assign any significant weight to this doctor's assessment of claimant's residual functional capacity. . . . Accordingly, the undersigned finds that the claimant is capable of simple unskilled (20 CFR 404.1568) work that does not involve more than low levels of stress or regular contact with the general public.

AR 20. Thus, the ALJ found that Coleman was not entitled to benefits. AR 23.

### III. **STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), the Court considers whether the ALJ's decision is supported by "substantial evidence" and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. The Court may not reweigh the facts or evidence and make credibility determinations, but it must conduct a critical review of the record, considering both the evidence that supports and detracts from the ALJ's decision. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (internal quotation marks and citation omitted). The Court limits its review to the reasons provided by the ALJ, and the ALJ decision cannot be upheld if it does not "'build an accurate and logical bridge from the

evidence to her conclusion.'" *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citation omitted).

DWIB is available to a widow of a deceased wage earner who has attained the age of fifty, is unmarried, and became "under a disability" no later than seven years from the death of the deceased wage earner. 42 U.S.C. § 402(e). Here, Coleman would have had to come under a disability no later than February 28, 1999. "Disability" means "inability to engage in any substantial gainful activity by reason of any medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 404.1527. "An individual shall be determined to be under a disability only if his physical or mental . . . impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

The claimant must show that "(1) he is not presently employed; (2) his impairment is severe; (3) his impairment is listed or equal to a listing in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) he is not able to perform his past relevant work; and (5) he is unable to

perform any other work within the national and local economy." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## IV. DISCUSSION

The primary issue here is whether the ALJ gave sufficient weight to the opinion of Coleman's treating physician, Dr. Tylkin, and whether the ALJ properly evaluated Coleman's residual functional capacity ("RFC"). The ALJ must evaluate all of the medical opinions she receives in addition to the other evidence in the record, and a treating source's opinion on the issue of the nature and severity of the applicant's impairment should be given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *Frobes v. Barnhart*, 467 F.Supp. 2d 808, 818 (N.D. Ill. 2006). "Controlling weight" means that the opinion must be accepted. SSR 96-2p. Even if the opinion of a treating source is not given controlling weight, it does not mean that the opinion can be rejected; it is "still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927 [length of the treatment relationship, frequency of examination, and nature and extent of the treatment relationship]. In many cases, a treating source's medical opinion

will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p; *see also* 20 C.F.R. § 404.1527(d)(2).

The Court agrees with Coleman that the ALJ did not give sufficient weight to Dr. Tylkin's opinion and did not provide sufficient explanation for rejection of Dr. Tylkin's opinion. The ALJ stated that a finding that Coleman's impairments were disabling was not supported by the "record as a whole," but the only part of the record she cited was Dr. Tylkin's treatment notes, which, according to the ALJ, "at least through March 2005" showed that Coleman "remained fairly stable when compliant with treatment." AR 20.

Substantial evidence does not support the ALJ's conclusion. The record as a whole shows that Coleman suffered from bipolar disorder with psychotic features that required medication from 1997 through 2005, and she suffered several serious breakdowns requiring hospitalization in 1997, 1998, and 1999. From 2001 through 2005, when Coleman was treated by Dr. Tylkin, she continued experiencing depression, anxiety severe enough to keep her awake at night, crying spells, and a panic attack that required an ER visit. *See* AR 278, 285-89.

Even the part of the record the ALJ cited does not support the ALJ's conclusion. First, the March 2005 treatment note indicating that Coleman was "stable" is not Dr. Tylkin's own note; rather, it appears to be a note written by a different Fantus Health Center

physician who examined Coleman on that occasion.  Dr. Tylkin's assessment of Coleman was not unsupported by or inconsistent with her own notes.

Second, while Dr. Tylkin noted once in February 2004 that Coleman was "stable on her medications without side effect," AR 281, the ALJ gives no explanation for why this notation would be inconsistent with Dr. Tylkin's assessment that Coleman's functional limitations were marked. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) ("an ALJ must 'minimally articulate his reasons for crediting or rejecting evidence of disability.'  The ALJ did not provide any explanation for his belief that Clifford's activities [taking short walks, performing chores, and shopping] were inconsistent with Dr. Combs's opinion [regarding limitation on Clifford's ability to perform work that requires standing or walking] and his failure to do so constitutes error.") (internal citation omitted); SSR 96-2p.  The ALJ refused to give Dr. Tylkin's opinion controlling weight on the basis of one perceived inconsistency, but "a well-supported treating source medical opinion need not be supported directly by all of the other evidence . . . as long as there is no other *substantial* evidence in the case record that contradicts or conflicts with the opinion." SSR 96-2p, at *3 (emphasis added).  The "other substantial evidence" in the record, such as Coleman's history of serious psychotic breakdowns and hospitalizations, the consulting physicians' diagnosis of Coleman's bipolar disorder, withdrawn mood, blunted affect,

compromised concentration, persistence, social interaction, and adaptation, and Coleman's own testimony, which the ALJ found "generally credible," did not contradict or conflict with Dr. Tylkin's opinion.

Given the episodic nature of bipolar disorder, an observation that Coleman was stable on her medication during one or two exams is not necessarily inconsistent with Dr. Tylkin's long-term evaluation of Coleman's ability to function in a normal work environment. *See Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) ("[The ALJ] thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic."); SSR 85-15, at *6 ("[i]ndividuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. . . . The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. . . . Thus, the mentally impaired may have difficulty meeting the requirements of even so-called 'low-stress' jobs.").

Moreover, the regulations require that the ALJ consider the length, nature, and extent of the treatment relationship and the frequency of examination in determining how much weight to give a treating source's opinion, *see* 20 C.F.R. § 404.1527(d)(2)(I) &

(ii), and the ALJ considered none of these factors. Even if the ALJ properly refused to give Dr. Tylkin's opinion controlling weight, she erred by not giving it any weight, particularly when Coleman had seen Dr. Tylkin numerous times over the course of several years. *See* SSR 96-2p.

The ALJ also did not "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant." 20 C.F.R. § 404.1527(f)(2)(ii). The regulations provide that "because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. § 404.1527(d)(3). Dr. Hermsmeyer gave no explanation at all for his conclusion that Coleman's ability to perform certain work-related activities over the course of a normal workweek (such as maintain attention and concentration for extended periods, perform activities on a schedule, ability to work in coordination with others, ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors) was "not significantly limited." *See* AR 262-65. The ALJ did not explain what evidence she was referring to when she stated that Dr. Hermsmeyer's conclusion was not "out of line with the evidence." *See* AR 19.

Finally, the ALJ did not properly assess Coleman's "ability to do sustained work-related physical and mental activities in a work

setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.'" SSR 96-8p, at *1; *see also* 20 C.F.R. § 404.1545(c) ("A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work."). The ALJ noted that Coleman engages in some basic daily activities (*e.g.*, "very little" housework, washing the dishes, doing her laundry, *see* AR 39-40), but the substantial evidence in the record does not show that she can function outside of her current limited environment. In *Clifford*, the Seventh Circuit held that "the ALJ does not explain why the objective medical evidence does not support Clifford's complaints of disabling pain. Rather, the ALJ merely lists Clifford's daily activities as substantial evidence that she does not suffer disabling pain. This is insufficient because minimal daily activities, such as those in issue, do not establish that a person is capable of engaging in substantial physical activity." *Clifford*, 227 F.3d at 872. Similarly, Coleman's daily activities do not establish that she is capable of engaging in sustained work-related activities on a regular and continuing basis, even if it is simple unskilled work.

## V. CONCLUSION

For the reasons stated herein, Coleman's Motion for Summary Judgment is granted and Defendant's Motion for Summary Judgment is denied.

This case is remanded to the Commissioner for further proceedings consistent with this opinion. Specifically, the ALJ must give serious consideration to the opinion of Coleman's treating physician, articulate specific reasons for the weight given to that opinion and the weight given to the opinions of the consulting and state agency physicians, and "take into consideration all of the evidence in the record and discuss significant evidence contrary to his ruling." *Spaulding v. Barnhart*, 2007 WL 1610445, *7 (N.D. Ill. Mar. 2, 2007) (quotation marks and internal citation omitted).

**IT IS SO ORDERED.**

　　　　　　　　　　　　　　　　　　Harry D. Leinenweber, Judge
　　　　　　　　　　　　　　　　　　United States District Court

**DATE:** April 9, 2008